UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

    vs.

8.83781706 Bitcoin (BTC) from Binance
UID account ending 1437 belonging to an
unknown user associated with email
address Jason7888@126.com, and

2,441,105.3122 Tether (USDT) from
Binance UID account ending 1437
belonging to an unknown user associated
with email address Jason7888@126.com
and from Binance UID account ending
5700 belonging to an unknown user
associated with email address
iloveudubai52@gmail.com,

      Defendant Property.

_____/

No. 1:26-cv-01883

**VERIFIED COMPLAINT FOR FORFEITURE IN REM**

NOW COMES Plaintiff, United States of America, by and through its attorneys, Timothy VerHey, United States Attorney for the Western District of Michigan, and Daniel T. McGraw, Assistant United States Attorney, and states upon in formation and belief that:

**NATURE OF ACTION**

1.      This is a civil forfeiture action filed pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 982(a)(1) and Supplemental Rule G(2) of the Federal Rules

1

of Civil Procedure, to forfeit and condemn to the use and benefit of the United States of America the following property:

a.   8.83781706 Bitcoin (BTC) from Binance UID account ending 1437 belonging to an unknown user associated with email address Jason7888@126.com (Subject Account 1), and

b.   2,441,105.3122 Tether (USDT) from Subject Account 1 and Binance UID account ending 5700 belonging to an unknown user associated with email address iloveudubai52@gmail.com (Subject Account 2), collectively "the Defendant Property."

## THE DEFENDANT IN REM

2.   The Defendant Property consists of virtual currency, also known as cryptocurrency, that was seized on or about January 19, 2026, by the Federal Bureau of Investigation ("FBI") pursuant to a seizure warrant authorized by the United States District Court for the Western District of Michigan (Case No. 1:25-mj-553-SJB). The Defendant Property is currently in the custody of the FBI.

## JURISDICTION AND VENUE

3.   This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1345 and 1355(b)(1)(A), because this action is being commenced by the United States of America as Plaintiff, and the acts giving rise to the basis for forfeiture occurred in this judicial district.

4.   Venue is proper before this Court pursuant to 28 U.S.C. § 1355(b)(1) because the acts or omissions giving rise to forfeiture occurred in this judicial district,

and/or pursuant to 28 U.S.C. § 1395(b), because the Defendant Property was found within this judicial district.

## BASIS FOR FORFEITURE

5.    As set forth below, the Defendant Property is subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because it is any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (concealment money laundering), and in violation of 18 U.S.C. § 1956(h) (money laundering conspiracy), or any property traceable to such property; and pursuant to 18 U.S.C. § 981(a)(1)(C), because it is any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343.

6.    Under 18 U.S.C. § 1956(a)(1)(B)(i), it is a criminal offense for anyone, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conducts such a financial transaction which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, here, wire fraud, in violation of 18 U.S.C. § 1343.

7.    Under 18 U.S.C. § 1956(h), it is a criminal offense to conspire to commit any offense described in section 1956, including 1956(a)(1)(B)(i).

8.    Under 18 U.S.C. § 1343, it is a criminal offense for anyone who has devised a scheme or artifice to defraud, or anyone who has devised a scheme or artifice

3

to obtain money by means of false or fraudulent pretenses, representations, or promises, to transmit by means of wire, radio, or television communication in interstate commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.

## FACTS SUPPORTING FORFEITURE

### Background on Virtual Currency (also known as Cryptocurrency)

9.    Virtual currencies are digital tokens of value circulated over the Internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank, like traditional fiat currencies such as the U.S. dollar, but are generated and controlled through computer software. Bitcoin ("BTC") is the most well-known virtual currency in use.

10.    Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether ("USDT") is a stable coin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

11.    Virtual currency addresses are the specific virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of alphanumeric characters. Each virtual currency address is controlled through a unique corresponding private key—the equivalent of a passworded needed to access the address. Only the holder of

4

an address's private key can authorize a transfer of virtual currency from that address to another address.

12.     Many virtual currencies publicly record their transactions on what is referred to and known as the "blockchain." The blockchain is essentially a distributed public ledger, run by a decentralized network, containing an immutable record of every transaction that has ever occurred using that blockchain's specific technology. The blockchain can be updated multiple times per hour and records every virtual currency address that ever received that virtual currency. It also maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

13.     Although the identity of an address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often be used to identify the owner of a particular address. The analysis can also, in some instances, reveal additional addresses controlled by the same user. A user of virtual currency can operate multiple addresses at any given time and there is no limit to the number of addresses any user can have.

14.     A virtual currency wallet is a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys. A virtual currency wallet also allows users to send and receive virtual currencies. Multiple addresses can be stored in a single wallet.

### Background on Virtual Currency Exchanges (including Binance)

15.    A virtual currency exchange is an online marketplace or platform that allows users to buy, sell, and trade various virtual currency, such as Bitcoin, using fiat currencies, like USD, or other virtual currencies. Virtual currency exchanges can be centralized (including Binance, MaskEx, Coinbase, Kraken, and Gemini), meaning it operates as a trusted middleman like traditional stock exchanges, or decentralized, meaning the platform uses smart contracts to facilitate trading directly between users without a central intermediary (including Uniswap, Pancake Swap, and dYdX). Binance is the largest virtual currency exchange in terms of daily trading volume of virtual currencies.

### Pig Butchering Scheme

16.    Upon information and belief, "pig butchering" is a sophisticated fraud scheme where scammers use social media to identify and subsequently groom victims with fake trust, affection, and promises of large investment returns. The scammer will typically create a fake profile to contact potential victims through social media applications, dating applications or sites, and even random text messages. The goal is for the scammer to initiate a cordial conversation with the victim, attempt to be their "friend" or "lover." The scammer slowly develops a relationship with the victim and builds trust, often through sharing pictures of a glamorous lifestyle. The scammer eventually persuades the victim to make a business investment using cryptocurrency with the promise of large returns. The scammer will typically employ persuasion rather than explicit requests for money because they know the victim is

savvy and potentially know that it is likely a scam when a stranger asks for money. However, the victim is gradually drawn into what appears to be benign talk about cryptocurrency investments and earnings, but is really manipulation into making an "investment." The scammer will convince the victim to invest in cryptocurrency and refer them to a bogus website or application that looks authentic but is controlled by the scammer or their conspirators. The victims are encouraged to invest small amounts at first, and the scammer will often make sure the victim receives a modest gain on the initial investment. Victims might even be allowed to withdraw funds once or twice in an effort to convince them the process is legitimate. The victims are then persuaded into investing larger amounts, sometimes hundreds of thousands, or even millions, of dollars. Once the larger amounts of money are sent to the fake investment platform, the scammer vanishes, taking all of the money with them, resulting in often significant losses for the victim.

17.    On August 29, 2025, the FBI National Threat Operations Center received a complaint that alleged Victim 1, a resident of Dimondale, Michigan, within the Western District of Michigan, lost $20 million through a pig butchering scheme.

18.    In the summer of 2025, Victim 1 received a random text message from a person purporting to be Leola Valeria Kulczyk ("Kulczyk"). Victim 1 continued text messaging with Kulczyk and eventually switched to communicating on WhatsApp. During subsequent communications, Victim 1 received information from Kulczyk about an investment opportunity via the WorldWealth Management Group ("WorldWealth").

19.     Kulczyk taught Victim 1 about virtual currency, including how to make deposits and withdrawals. Victim 1 had never invested in virtual currency before. Kulczyk first instructed Victim 1 to open an account with Payward Interactive, Inc., doing business as Kraken (hereafter referred to as "Kraken"), a centralized virtual currency exchange. Kulczyk then instructed Victim 1 to download a Base wallet that contained WorldWealth's web address, www.worldnwa.com.

20.     Kulczyk guided Victim 1 through the Base wallet application, including on how to toggle demo mode under the "Earn" button. In the demo mode, Kulczyk showed Victim 1 a daily 2% fund return for WorldWealth fund "Gold AI Arbitrage," which allegedly used sophisticated artificial intelligence means. Victim 1 practiced investing virtual currency at www.worldnwa.com using the demo mode in the Base wallet and saw significant return on the fictious or practice investments.

21.     Kulczyk then instructed Victim 1 to wire funds from their PNC Bank account to their Kraken account to purchase Bitcoin, and then transfer the Bitcoin from their Kraken account to the "AI Finance" fund in the Base wallet application. On July 2, 2025, Victim 1 transferred $125,000 to Kraken to purchase 1.13834 BTC, which was then transferred to the "AI Finance" fund in the Base wallet. The Base wallet application showed a balance of the money Victim 1 invested in the "fund," which, was a fraud scheme.

22.     After seeing significant returns on the initial investment, Victim 1 transferred the following amounts from their PNC Bank account to the Kraken

account, which was then transferred to the "AI Finance" fund account in the Base wallet application:

    a.  July 15, 2025:    $650,000 to purchase 5.524862 BTC

    b.  July 21, 2025:    $1,000,000 to purchase 8.38223 BTC

    c.  July 25, 2025:    $3,000,000 to purchase 25.59727 BTC

    d.  July 28, 2025:    $1,500,000 to purchase 12.59446 BTC

    e.  August 12, 2025:  $1,500,000 to purchase 12.62626 BTC

    f.  August 12, 2025:  $3,500,000 to purchase 29.16181 BTC

23.    At some point after August 12, 2025, Victim 1 attempted to withdraw investment funds from the Base wallet application for a real estate purchase. Victim 1 was unable to withdraw funds and was told by support at www.worldnwa.com that Victim 1 could only withdraw money from their account if Victim 1 invested an approximate equal amount of what was already invested into the fund. On the following dates, Victim 1 transferred the following funds from their PNC Bank account to their Kraken account, and ultimately, to the www.worldnwa.com Base wallet account:

    a.  August 27, 2025:  $5,700,000 to purchase 50.81346 BTC

    b.  August 28, 2025:  $3,450,000 to purchase 30.64215 BTC

24.    After Victim 1 made the additional deposits, support at www.worldnwa.com told Victim 1 that they needed to make an additional deposit of approximately $4,000,000 to unfreeze the funds in the investment fund. Victim 1 realized they were being scammed and reported the incident to the FBI.

25.    Upon information and belief, once the funds were transferred to www.worldnwa.com, the funds were then transferred to other virtual currency addresses that were not in the name of, or under the control of, Victim 1. These types of multiple transactions are commonly done by individuals engaged in this type of fraud to make it more difficult for law enforcement to trace.

26.    The following diagram shows the virtual currency tracing of Victim 1's funds from the Kraken virtual currency exchange account through multiple other transactions before the funds, approximately 30.64 BTC, were transferred into three wallet addresses held by two accounts—Subject Account 1 and Subject Account 2— at Binance:



27.    On October 8, 2025, Binance accepted a request to freeze the 30.64 BTC held in Subject Account 1 and Subject Account 2.

28.    Specifically, FBI virtual currency tracing of the funds from Victim 1's Kraken account to the wallet addresses held by Binance showed the following regarding the Defendant Property that is subject to forfeiture:

a.    On    October    1,    2025,    wallet    address 15Du1C3aH1rkY31tahbXBTAHu5yft9mtLH held by Binance UID ending 1437

(Subject Account 1[1]) received approximately 1 BTC from Victim 1 via transaction hash ending b7422;

b.    On    October    1,    2025,    wallet    address bc1qzh80c799tc9c8qa6a7xq580c5dpvg73qeu9kdy held by Binance UID ending 1437 (Subject Account 1) received approximately 19 BTC from Victim 1 via transaction hash ending 234db and transaction hash ending 3173b; and

c.    On    October    3,    2025,    wallet    address 1D2YuTTvSbjsjvtGFoZyv54WGRhWrU9Bun held by Binance UID ending 5700 (Subject Account 2[2]) received approximately 10.64 BTC from Victim 1 via transaction hash ending eab4a.

29.    A portion of the BTC traced into Subject Accounts 1 and 2 was subsequently converted into USDT.

30.    On or about January 19, 2026, FBI seized 8.83781706 BTC from Binance Subject Account 1, and 2,441,105.3122 USDT from Subject Account 1 and Subject Account 2, pursuant to a seizure warrant issued by the United States District Court for the Western District of Michigan, Case No. 1:25-mj-553-SJB.

31.    Upon information and belief, the Defendant Property constitutes proceeds of wire fraud, and property involved in money laundering, all of which is subject to forfeiture to the United States.

---

[1] Subject Account 1 belongs to an unknown user associated with email address Jason7888@126.com.

[2] Subject Account 2 belongs to an unknown user associated with email address iloveudubai52@gmail.com.

32.    Upon information and belief, the Defendant Property was involved in concealment money laundering. Criminals often conduct an otherwise unnecessary and costly number of transactions to transfer criminal proceeds via layered transactions designed to conceal or disguise the nature, location, source, ownership, or control of those proceeds. The large number of rapid transfers described above—which have no apparent legitimate purpose—strongly indicate that these funds were transacted in a way designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity, in this case, wire fraud.

33.    The public blockchain analysis in this case, summarized above, demonstrates that the proceeds of the wire fraud scheme were broken up, distributed through a series of virtual currency addresses via rapid transactions, and re-consolidated with other funds in different virtual currency addresses, including Subject Account 1 and Subject Account 2.

34.    The commission of convoluted, intermingled, and re-consolidated transactions, which incurred transaction fees and served no apparent legitimate purpose, imply that the "purpose of these numerous, fast-repeating, and intermingled transactions was to conceal the nature, source, location, ownership and control of the proceeds." *See, e.g.*, *United States v. Sterlingov*, No. 1:21-cr-00399-RDM, 2023 WL 2387759, *7 (D.D.C. Mar. 6, 2023) (concluding that "there is probable cause to believe that [defendant's] seized funds"—even if not proceeds of crime—"were 'involved in'" defendant's Bitcoin tumbler business' "unlicensed money

transmitting operations" that mixed Bitcoins for a fee, making it more difficult to trace); *United States v. Rodriguez*, 53 F.3d 1439, 1447-48 (7th Cir. 1995) (convoluted real estate transactions, from which intent to conceal or disguise may be inferred, also imply knowledge of illegal source; jury could infer knowledge from combination of suspicion and indifference to the truth).

35.    Where it is shown that a suspected money launderer commingled proceeds of specified unlawful activity with untraced funds in an address or wallet via such transactions apparently designed to conceal the nature, source, ownership, location, or control of criminal proceeds, then those commingled untraced funds are forfeitable as having facilitated—and therefore as having been "involved in"—concealment money laundering. *See, e.g.*, *United States v. Bikundi*, 926 F.3d 761, 793-94 (D.C. Cir. 2019) (collecting cases); *see also United States v. Guerrero*, 2021 WL 2550154, *9 (N.D. Ill June 22, 2021) (money from unknown source that was commingled with fraud proceeds facilitated the concealment laundering of fraud proceeds and, accordingly, property acquired with the commingled funds was forfeitable as property traceable to property involved in a money laundering offense); *United States v. Romano*, 2021 WL 1711633, *5-6 (E.D.N.Y. Apr. 29, 2021) (by laundering fraud proceeds through their personal bank accounts, to commingle the proceeds with other funds for a concealment laundering purpose, the defendants made the commingled funds forfeitable as facilitating property); *United States v. Coffman*, 859 F. Supp. 2d 871, 876-77 (E.D. Ky. 2012) (holding that forfeiture of legitimate and criminal proceeds commingled in an account is proper as long as the

13

government demonstrates that the defendant pooled the funds to facilitate money laundering by, for example, disguising the nature and source of proceeds; concluding that clean funds in bank account were subject to forfeiture because they had "been co[m] mingled with tainted funds for the purpose of obfuscating the origin or existence of tainted money.").

36.     The transfer of fraud proceeds into the same address or financial account via transactions committed within a relatively short time period strongly indicates that the other funds contained in the address or account are also fraud proceeds and, likewise, that the address or account is being used to collect, conceal, and launder those funds. As shown above, this matter involves such transfers of criminal proceeds into the Subject Account 1 and Subject Account 2.

## CLAIM I

37.     Plaintiff hereby re-alleges paragraphs 1 – 36, as referenced above.

38.     The Defendant Property is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because it is any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or any property traceable to such property.

## CLAIM II

39.     Plaintiff hereby re-alleges paragraphs 1 – 36, as referenced above.

40.     The Defendant Property is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because it is any property, real or personal, which

14

constitutes or is derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343.

## REQUESTED RELIEF

Wherefore, the United States requests that the Court issue a warrant for the arrest of the Defendant Property; that due notice be given to all interested parties to appear and show cause why forfeiture to the United States of America should not be decreed; and that the Defendant Property be condemned and forfeited to the United States of America and be delivered into the custody of the United States Postal Inspection Service or the United States Marshals Service for disposition according to law; and for such other relief as this Court may deem just and proper.

TIMOTHY VERHEY
United States Attorney

Dated: June 18, 2026

DANIEL T. McGRAW
Assistant United States Attorney
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404

15

**VERIFICATION**

I am a Special Agent with the Federal Bureau of Investigation with personal involvement in this investigation.

I have read the contents of the foregoing Verified Complaint for Forfeiture In Rem, and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: _____06/17/2026_____

_____
ANDREW DECOSTER
Special Agent
Federal Bureau of Investigation